[Civ. No. 9480. Third Dist. Apr. 1, 1959.]

HOWARD A. CLARK, Appellant, v. DEAN S. LESHER et al., Respondents.

Savage & Shepard for Appellant.

Green, Green & Bartow, Coffee & Wolfe and Everett L. Coffee for Respondents.

VAN DYKE, P. J.—This is an appeal from a judgment entered by the court after a trial of special defenses in an action for damages for fraudulent conspiracy. The facts and history of this litigation are set forth in *Clark* v. *Lesher,* 46 Cal.2d 874 [299 P.2d 865]. We think it unnecessary to here repeat the Supreme Court's recital in that decision of the history and background of this action. For the present it will suffice to say that the complaint herein charged the following: Upon the death of appellant's father, respondent Lesher, who owned a newspaper in an adjoining county, bought a paper being published in Madera and appointed respondent Halcomb as manager thereof. Lesher and Halcomb then conspired to eliminate a rival paper, the Madera Tribune, being published by appellant as a surviving partner, from competition in the Madera field. Clark's newspaper had been owned in partnership by himself and his father. In furtherance of the conspiracy, Lesher purchased the heirship rights of the two children of appellant's father in said decedent's partnership interest in the newspaper. One Jay was the administrator of the senior Clark's estate. Without the knowledge or consent of Jay, Lesher brought an action entitled "*Jay* v. *Clark*" in the name of said administrator and for the purpose of ousting appellant from possession of the news-

paper. After entry of the interlocutory judgment in *Jay* v. *Clark*, which judgment ordered Clark to account to his father's estate for his management of the newspaper as surviving partner, Lesher and Halcomb approached one Wolfe, telling him that they would arrange to have him appointed as receiver of the partnership, in which event he was to discontinue the publication of the newspaper. Wolfe agreed to the plan and Lesher and Halcomb procured the order appointing Wolfe as receiver of the partnership without the knowledge or consent of said administrator and without notice to appellant. Although the interlocutory judgment directed that the business be sold as a going concern, Lesher, Halcomb and Wolfe conspired to obtain an order authorizing the presale cessation of the publication. In an ex parte proceeding conducted without securing the consent of the administrator and without giving notice to appellant, Wolfe, by knowingly misrepresenting to the court that there were not sufficient funds to continue publishing the paper procured the order directing that publication be discontinued within 10 days and that the business be sold. The newspaper could have been sold to best advantage while being published and circulated and defendants knew that cessation of its publication would cause irreparable damage to its owners. When publication ceased there was a total destruction of the good will of the newspaper. Immediately thereafter, advertisement and subscription rates of Lesher's newspaper were raised. In collaboration with Halcomb and Wolfe, Lesher entered a bid to buy the newspaper, offering to raise any other bid by $200. Lesher's bid was accepted and the assets of the newspaper were delivered to him.

A general demurrer to the complaint was sustained without leave to amend and judgment was entered accordingly. On appeal the judgment was reversed on the ground that the complaint stated a cause of action in tort for fraudulent conspiracy to destroy and depreciate the good will of the partnership. (*Clark* v. *Lesher*, 106 Cal.App.2d 403 [235 P.2d 71].) Respondents answered, denying the fraudulent conspiracy and alleging four affirmative defenses. The trial then proceeded on these special defenses, a jury returned a verdict for the defendants, respondents here, and on appeal this judgment was in part reversed. As to two of the special defenses the Supreme Court (*Clark* v. *Lesher*, 46 Cal.2d 874 [299 P.2d 865]) held that they were not valid defenses as a

matter of law. As to two other special defenses the Supreme Court directed a retrial in accordance with the court's ruling as to the validity of those defenses. The case was remanded to the trial court and it has now again been tried as to the two said special defenses. This time the trial was before the court without a jury and the trial court made findings and entered judgment sustaining the two special defenses.

We think it necessary to discuss only one of the special defenses sustained by the trial court as it effectually disposes of the action if, as we hold, the defense was properly made out. It was specially pleaded by respondents, Lesher and Halcomb, that the cause of action sued upon herein had been assigned to Lesher under an agreement made in a preceding action which led to a stipulated judgment therein. Said the Supreme Court in *Clark* v. *Lesher, supra,* at page 883:

". . . By the terms of the agreement Clark and his wife assigned to Lesher 'all of their rights, title and interest of every kind and nature in and to the properties in the Estate [the estate of appellant's father George Clark]' and 'all claims of every kind, nature, and description that they have heretofore filed against said Estate, or which they might hereafter assert against said Estate,' together with 'their entire interest in the partnership . . . and in all assets of said partnership.' The cause of action, being one for the fraudulent destruction of the good will of the newspaper, arose out of the violation of a right of property, and it was, therefore, assignable and could have been included in the agreement, if the parties so intended. [Citing cases.]

"The case was tried on the theory that the question of whether the cause of action for fraud had been assigned to Lesher was to be determined from the face of the written instrument. Under this theory the construction of the writing was the responsibility of the trial court and not the function of the jury. [Citing cases.] The instructions of the court, however, erroneously left to the jury the legal question of the interpretation of the assignment.

"Defendants urge that the error was not prejudicial, asserting that it can be said as a matter of law that under the terms of the instrument Clark transferred his cause of action to Lesher. We do not agree. The assignment is reasonably subject to opposed constructions with respect to whether the parties intended to include the cause of action for fraud. The broad language used might be fairly construed to mean

that Clark parted with all rights arising out of his connection with the newspaper, including the right to recover for fraudulent injury to its good will. On the other hand, the assignment does not mention the cause of action for fraud or any claim against Lesher or the other defendants, and the reference to the 'assets' of the newspaper might be understood as applying merely to items of property involved in operating the business and not to a right to recover for prior tortious injury to such property. Evidence relating to the negotiations which preceded execution of the assignment was introduced, but it was limited by the trial court to the separate defense that Clark was estopped to deny the transfer. The evidence could properly have been received as an aid to the construction of the instrument, but the court ruled it was inadmissible for that purpose. . . . [t]he extrinsic evidence was conflicting, and, since the intention of the parties to the agreement may be determined by resolving the conflicts, we should not attempt to construe the assignment as a matter of law.''

On the retrial of the issue as to whether or not the cause of action had been assigned to Lesher, a great deal of testimony, both oral and documentary, was received by the court. Once again it was much in conflict. The trial court made findings that the cause of action sued upon had been transferred to Lesher and therefore no longer belonged to appellant. Judgment in favor of all defendants to the action was entered, after which this appeal was taken.

The trial court filed in the cause a document entitled ''Decision on Trial of Special Defenses.'' Later in the findings of fact the court adopted by reference said ''Decision on Trial of Special Defenses.'' Selected quotations from that document so made a part of the findings will sufficiently show the basis of the trial court's decision on the issue of transfer and by its recitals will furnish a sufficient test of the propriety of the trial court's ruling on that special defense:

''Did the Assignment of June 23, 1949, from Howard Clark to Lesher, executed and filed in the Matter of the Estate of George A. Clark, Deceased, No. 2038 of this Court, transfer to Lesher plaintiff's cause of action for fraud as against all defendants?

''. . . . . . . . . . . . . .

''The Supreme Court, in the last appeal herein, 46 Cal. 2d 874, held that the Assignment is ambiguous and that the

ambiguity should be resolved by extrinsic evidence. Pursuant thereto, this Court heard extended testimony from all who participated in any way in the events immediately preceding the execution of the Assignment. The conclusion from such testimony is inescapable:

"A. That the defendants Lesher and Wolfe understood that by the Assignment all matter of possible dispute between them and Clark were being settled;

"B. That Howard Clark was assigning to Lesher all claims of every kind and character arising out of the affairs of the Madera Tribune, particularly in connection with its operation since the death of George Clark and its shutdown as a newspaper in July of 1948; and

"C. That Howard Clark knowingly led the defendants Wolfe and Lesher to rely on these understandings in the course of their settlement negotiations which culminated in the execution of the Assignment and the Judgment which followed, which Judgment is filed in the case of *Wolfe* v. *Clark*, No. 7656 of this Court.

"True, no general release was executed. This is understandable from an examination of the circumstances and the haste under which the Assignment was negotiated and executed. Those circumstances may be summarized as follows:

"1. At the time of George Clark's death in September, 1944, he and his son, Howard, plaintiff herein, each owned a one-half interest in the Madera Tribune. Following the death of George, and continuously until Wolfe qualified as Receiver on June 25, 1948, Howard Clark continued to operate the Tribune. He did so without consulting the administrator or heirs of the George Clark Estate, taking the position that he had no obligation to them.

"2. From shortly after George Clark's death until the execution of the Assignment, June 23, 1949, the affairs of the Tribune had been the source of bitter controversy between Howard Clark, hereinafter referred to as 'Clark,' and all who claimed any interest in the Tribune. The latter include Jay, the Administrator of George Clark's Estate (see *Jay* v. *Clark*, No. 6555 of this Court, and 85 Cal.App.2d 88 [192 P.2d 462]); Wolfe, the Court-appointed Receiver (see *Wolfe* v. *Clark*, No. 7656 of this Court); and Lesher (see: (1) *Clark* v. *Lesher*, 46 Cal.2d 874 [299 P.2d 865]; (2) 106 Cal.App.2d 403 [235 P.2d 71]; and (3) *Wolfe* v. *Clark, supra*); who in 1948 became part owner of the Tribune and later in 1948 became sole owner.

"3. Wolfe, as Receiver of the Tribune, had sued Lesher in Action No. 7563 of this Court.

"4. Clark had appealed an adverse decision in *Jay* v. *Clark, supra.* Two years had elapsed between the decision of the trial court and the decision of the Appellate Court. In that case, the trial court found and the District Court of Appeal had affirmed by implication, if not expressly, that Clark had been guilty of bad faith in refusing to render an accounting of his stewardship of the Tribune following the death of George Clark.

"5. Among other things, the Court, in *Jay* v. *Clark,* ordered Clark to account and directed that a Receiver be appointed to wind up the partnership affairs and to sell its assets, to-wit, the Tribune. More than a year intervened between the affirmance by the District Court of Appeal and the Supreme Court's denial of a hearing on June 10, 1948, in *Jay* v. *Clark,* and the date of the Assignment in issue, June 23, 1949. Despite the affirmance of the judgment requiring him to account, Clark continued to take the position, and aggressively so, that he either could not or did not have to account to the Administrator, Lesher, or the Court.

"6. At the start of the trial on June 21, 1949, in *Wolfe* v. *Clark,* Clark and his wife were urging substantial claims against the Tribune. Lesher had cross-complained therein, denying all of the claims of the Clarks and alleging that Lesher, alone, was entitled to possession of all of the assets of the Tribune.

"7. On the first day of that trial there had been testimony that Clark had used funds of the Tribune for his personal use. This, of course, was of vital concern to Jay, the Administrator of the George Clark Estate, and to Lesher as owner of a two-sixths interest in the George Clark Estate and of the entire interest in the Tribune through his purchase thereof at the Receiver's sale.

"8. Between the time Lesher acquired a two-sixths interest in the Tribune in 1944 (the year of his purchase of the interests of Merritt and Thalia in the Estate of George Clark, Deceased) and the Receiver's sale of the Tribune to Lesher in 1948, Clark and his then attorney had been unrestrained in their denunciation of Lesher.

"9. As further grist for the mill of discord, Lesher, according to Clark's allegations herein (complaint verified July 8, 1949), had conspired to put the Tribune out of busi-

ness. True, this Complaint was filed two weeks after the execution of the Assignment. But, though given every opportunity by the Court to do so, Clark's counsel showed little inclination to point out just what new evidence he and Clark had discovered between June 23 and July 8, 1949, on which to base the allegations of the complaint herein. It is clear to the Court that all of the allegations of Clark's complaint herein were based upon information, real or imaginary, in his possession on June 23, 1949. Thus, on the second day of the trial in *Wolfe* v. *Clark*, June 22, 1949, a situation more ideally crying for settlement of all possible claims between all of the parties would be difficult to imagine.

"It is disputed whether Mr. Child, who was present as attorney for the Administrator during the trial of *Wolfe* v. *Clark*, or Mr. Savage, as attorney for Clark, proposed that there be a settlement. It is undisputed, however, that all agreed that a settlement was desirable and that the trial was recessed for that purpose.

"The question now is—what did they purport to settle?

"Clark and Savage testified that settlement negotiations, conducted in the corridor of the Courthouse on June 22 and 23, 1949, were expressly limited to the matter then in litigation.

"Child, Wolfe, and Coffee, all attorneys and all opposed to Clark at the time of the Assignment, testified in substance that it was understood that all matters arising out of the affairs of the Tribune and the relationship of Mr. and Mrs. Clark, Lesher, and Wolfe in relation thereto, constituted the subject matter of the settlement negotiations and of the Assignment.

"The Court accepts the view of the defendants and rejects that of the plaintiff.

"It will serve no useful purpose to restate the testimony in detail. Suffice it to point out that Clark and Savage each testified that Clark brought home to Savage privately, during the negotiations on June 22 and 23, 1949, that he did not want to settle if it meant waiving his alleged claim for wrongdoing on the part of Lesher and perhaps others in bringing about the shutdown of the Tribune. Savage may have felt that by the wording of the Assignment he was protecting and reserving Clark's right in that respect. The Supreme Court held that the Assignment was subject to that construction, although equally subject to the opposing construction (*Clark*

v. *Lesher,* 46 Cal.2d 874, at p. 884 [299 P.2d 865]). This court now finds that if such was the intention of Messrs. Clark and Savage, it was an undisclosed intention to reserve of which Clark may not now belatedly avail himself.

". . . The rule is stated thus in the Piazza case, *supra,* at page 230 [141 Cal.App.2d 226 (296 P.2d 368)]:

" '. . . in determining whether there has been a mutual consent to contract the courts are not interested in the subjective intent of the parties, but only in their objective intent —that is, what would a reasonable man believe from the outward manifestations of consent.' The Court believes that a reasonable man present at the discussions on June 22 and 23, 1949, and having no interest in the subject matter, would have understood and concluded that the parties were settling all matters between them of every kind and character relating to the Tribune.

"These considerations also materially affect the Court's thinking and conclusions:

"A. The testimony was unanimous that the Assignment contemplated that Clark should be relieved of all obligation to account for his stewardship of the Tribune—extending over a period of five years. This, despite the testimony on June 21 and 22, 1949, that he had used, for his personal use, funds of the Tribune in which the Administrator, Lesher, as heir and co-owner, and Wolfe, as Receiver, had an interest. Yet the Assignment is silent as to any waiver or release. Therefore, admittedly, the Assignment does not on its face include all matters on which there was clear agreement.

"Even this omission is understandable. After five years of discord and litigation, all parties were relieved to find that perhaps everything between them could be settled—although it now appears that Clark had a reservation that he withheld from all except his attorney. The settlement, i.e., the Assignment, was negotiated, signed, and judgment thereon rendered, all in less than twenty-four hours. The $5,000 called for by the Assignment was paid to Clark on the same day; namely, June 23, 1949. The desire on the defendants' part to settle everything, and the desire on Clark's part to receive cash in hand and to be relieved of his obligation to account, undoubtedly caused the defendants on the one hand to overlook the desirability of obtaining an express general release, and on the other hand, caused Clark's attorney to overlook an express release of the matter admittedly uppermost in Clark's

mind; viz. a release of Clark's obligation to account. Both Mr. Savage and Mr. Clark testified that a waiver of accounting was uppermost in Clark's mind. Understandably so, because this Court and the District Court of Appeal had ordered Clark to account.

"Clearly, therefore, the Assignment did not by its terms cover all of the matters admittedly agreed upon.

"B. In the light of all the circumstances, it is difficult to believe that anyone situated as were Lesher and Wolfe, particularly Lesher, would knowingly agree to a settlement waiving Clark's obligation to account and involving a cash payment to Clark if they suspected that they would face still another lawsuit arising out of the affairs of the Tribune.

"C. Clark points out that he personally received only $500 of the $5,000 paid in the settlement. This overlooks the fact that Clark's wife received $4,500 for her disputed claims against the Tribune. It also overlooks the facts: (1) that Lesher had already paid $30,750 for a 'dead' newspaper and $10,000 additional for a two-sixths interest while the paper was still operating, despite the fact that Clark and his then attorney had constantly maintained that as a *going* newspaper the Tribune was not worth that amount of money; (2) that the Tribune, when Wolfe took over as Receiver, was at best in a precarious financial condition, if not bankrupt; (3) that Lesher waived Clark's accounting of the stewardship of the paper from 1944 to 1948; and (4) that the Clarks received personal property of nominal value.

"In the light of the foregoing, the most reasonable interpretation is that the defendants Lesher and Wolfe believed, and were led to believe by Clark, that everything between them arising out of the affairs of the Tribune was being settled on June 23, 1949; further, that mention of Clark's claim against the defendants, on which this action is based, was either deliberately and in bad faith withheld from the defendants, or it was strictly an afterthought arising after the execution of the Assignment. This Court believes that it was a bit of both, and concludes that Clark cannot now avail himself of the situation which he created. Since Clark transferred all of his rights and claims involving the Tribune to Lesher, his cause of action, if any existed, as against Halcomb and Wolfe, as well as against Lesher, is no longer Clark's to assert."

Another statement of the rule of interpretation relied upon by the court as stated in the foregoing quotation from the

court's decision is found in 3 Corbin on Contracts, section 538, at page 45:

". . . A contractor is bound in accordance with the meaning that he induces another to understand and act upon, if he knows or has reason to know that the other will so understand and act. And in determining whether or not he has reason to know, the court should be advised of all the surrounding circumstances; of the meaning that is given to the language of the agreement by common usage, by usage in the trade or business or profession of the parties; of communications between the parties during preliminary negotiations and during the execution of the writing; and of subsequent interpretations and practical application by either party that is assented to or acted upon by the other."

The record discloses that in all essential particulars there was before the court the probative matters which the court declared it relied upon in making its decision defining the scope and effect of the assignment. We will quote a few parts thereof. Mr. Child testified: "To the best of my recollection, Mr. Savage said: 'We ought to get together and settle all the claims of the parties,' meaning Mr. Lesher, Mr. Howard Clark, his wife, Mr. Jay, as administrator, and Betty and Merit. We had discussed the matter of the accounting which, of course, was due two ways, to the estate and by the receiver, the matter of certain personal property that was owned by or claimed to be owned by Mrs. Howard Clark, the matter of the claims that were to be filed, or could be filed in the estate of Clark—all issues between the parties were to be settled by the payment of $8,000. . . . Q. At any time, Mr. Child, during the proceedings involving the settlement which you have related, during any of the conversations that took place relative thereto, were you ever informed, either by Mr. Clark or Mr. Savage or anyone, that Mr. Clark had any claim that was not being settled in that transaction? A. No, Mr. Green. To the contrary, Mr. Savage said he had been able to settle the claims of the parties, where nobody else had succeeded. Q. When was the first time you heard of the claim that was asserted in this lawsuit? A. I believe by a newspaper article some weeks subsequent." Mr. Wolfe testified as follows: "Q. Were you present at that time when any conversation took place between Mr. Savage and Mr. Child? A. I was present when Mr. Savage directed a comment toward Mr. Child—we were all around the counsel table—to the effect that, 'Can we settle all this trouble and litigation?' . . . Q. At

any time, Mr. Wolfe, after publication of the newspaper was terminated by you, did either Mr. Clark or Mr. Savage complain to you of the fact that the newspaper publication had been terminated? A. No. They have never mentioned to me that specific complaint. There were a number of complaints, but that was not one of them.'' Mr. Coffee who was present at the time of the negotiations for settlement testified: ''Do you recall anything else regarding that conversation, as to the substance of it, about what was to be settled? A. That all of the litigation and all the matters in connection with this whole Clark estate and Tribune matter could be settled. . . . I mean that this whole thing, and all the litigation, and all the matters in connection with this Tribune partnership should be settled.''

We are satisfied the trial court could, as it did, conclude that under the circumstances appellant Clark knew that by keeping silent concerning the cause of action herein sued upon by him he would induce in his opponents an understanding that they were getting what amounted to a general release as to any controversy arising out of any of the matters of the George Clark estate, or arising out of his handling of the Tribune after his father's death, including all matters arising out of the sale of that newspaper to Lesher. He was therefore bound in accordance with the meaning that he induced his opponents to understand and act upon as to the scope of the assignment.

The judgment is affirmed.

Peek, J., and Schottky, J., concurred.